UNITED STATES DISTRICT COURT
EASTERN DISTICT OF MICHIGAN
SOUTHERN DIVISION

VERONICA CAREY,

                        Plaintiff,              Case No.: 11-cv-11010
                                                Honorable Avern Cohn
          v.                             Magistrate Judge David R. Grand

MICHAEL ASTRUE,
Commissioner of Social Security,

                        Defendant.
_____/

### REPORT AND RECOMMENDATION
### ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [8, 10]

Plaintiff Veronica Carey brings this action pursuant to 42 U.S.C. § 405(g), challenging a final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") under the Social Security Act (the "Act"). Both parties have filed summary judgment motions which have been referred to this court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).

I.       RECOMMENDATION

For the reasons set forth below, the court finds that substantial evidence supports the Administrative Law Judge's ("ALJ") assessment that Carey was not disabled during the relevant period between October 1, 1999 and December 31, 2004. Accordingly, the court recommends that the Commissioner's Motion for Summary Judgment [10] be **GRANTED**, Carey's motion [8] be **DENIED** and that, pursuant to sentence four of 42 U.S.C. § 405(g), the Commissioner's decision be **AFFIRMED**.

**II.    REPORT**

**A.    Procedural History**

On May 25, 2007, Carey filed an application for DIB, alleging disability as of October 1, 1999. (Tr. 46; 94).[1] The claim was denied initially on July 31, 2007. (Tr. 47-50). Thereafter, Carey filed a timely request for an administrative hearing, which was held on August 17, 2009 before ALJ Joanne Adamczyk. (Tr. 21-45). Carey (represented by attorney Mikel Lupisella) testified, as did vocational expert ("VE") Judith Vandora. (*Id.*). On December 11, 2009, the ALJ found that Carey was not disabled. (Tr. 9-20). On January 7, 2011, the Appeals Council denied review. (Tr. 1-5). Carey filed for judicial review of the final decision on March 14, 2011 [1].

**B.    Background**

*1.    Disability Reports*

In an undated disability report, Carey reported that the conditions preventing her from working included chronic pulmonary obstructive disorder ("COPD"), asthma, emphysema, and high cholesterol. (Tr. 94). She reported that these conditions limited her ability to work because she had a "hard time breathing and concentrating." (*Id.*). She reported that her alleged onset date was October 1, 1999, the date she left her job of thirty years as a clerk for a telephone company. (*Id.*). She reported being treated by a number of doctors and taking the following medications for her conditions: Advair and Proventil for emphysema, Lipitor for cholesterol, Singulair and Uniphyl for asthma, Traimterene for blood pressure, Asterlin for her nose and Zyrtec for allergies. (Tr. 98).

In a work history report dated June 20, 2007, Carey stated that she "took several

---

[1] Carey's actual application for benefits is not in the file, so the date of application was determined by the initial denial transmission form.

FMLA's" during her time at her job, due to what she believed was a "sinus allergy." She reported that it was ultimately determined not to be a sinus allergy but COPD and that "if I had known I had COPD in 1999, I never would have retired on regular retirement, but each year it has advanced more." (Tr. 117).

In a function report dated June 20, 2007, Carey reported that she lived in a house with her husband who had had open heart surgery in March 2007. (Tr. 118-119). She reported that her conditions prevented her from exercising, and that while she could perform personal care functions, she had to dress, bathe and care for her hair "slowly." (Tr. 119). She reported, however, that she was able to prepare "complete meals with courses" daily, as well as do chores such as cleaning and laundry (albeit "slowly") and mow the grass on a riding lawn mower while wearing a mask. (Tr. 120). She reported that she drove, was able to go out alone, and would shop for groceries monthly. (Tr. 121). Carey reported that her interests included church, watching television and reading. (Tr. 122). She reported that she attended church twice a week, as well as met with friends from church and traveled with the pastor to give communion to others every other month. (*Id.*). She reported that due to her conditions she was tired by the time she made it to church, that she was tired and out of breath watching television and that she did not have the energy to read like she used to. (*Id.*).

Carey reported that she was able to walk one-half mile with a break in the middle, and climb at most four stairs. (Tr. 123). She reported that her breathing difficulties made it hard for her to complete tasks and she also had trouble balancing. (*Id.*).

In a disability appeals report dated August 19, 2007, Carey reported that there were changes in her condition since her initial application, but when asked what those changes were, she stated: "since 1999 severe lung problems." (Tr. 105). Asked when those changes occurred,

she stated: "1999." (*Id.*). When asked what changes had occurred in her daily activities, she stated: "cannot do much because of shortness of [breath]; chest pains and fatigue." (Tr. 107).

### 2.    *Plaintiff's Testimony*

At the hearing, Carey testified that she recalled first being diagnosed with COPD in 2004. (Tr. 27). She could not recall whether she was taking medication for breathing problems before that time. (Tr. 28). She testified that she had difficulty performing self-care tasks such as curling her hair, and she would take breaks. (Tr. 30). She testified she would drive locally to church, stores and the doctor's office. (Tr. 30). She also testified that she performed some housework, but that her husband shared those duties with her. (Tr. 31).

Carey testified that she would get out of breath if she walked fast or lifted heavy things, but that she believed she could lift at least a gallon of milk. (Tr. 31-32). She testified that she had trouble climbing stairs and balancing but that she had no trouble sitting. (Tr. 32-33). Carey testified that environmental conditions, such as high humidity, extreme heat, as well as dust and chemicals in the air negatively affected her condition. (Tr. 36). She testified that she had worked at her job for thirty years, but that toward the end she took a lot of time off under the Family Medical Leave Act for headaches, asthma and breathing problems. (Tr. 38). She testified that her doctor, Dr. Kella, would write her a prescription for antibiotics and her problems would clear up "most of the time." (*Id.*). She testified that she had been tired at work and she would nap during her breaks. (Tr. 38-39). After she stopped working, Carey testified that she would nap approximately one to two hours a day. (Tr. 39). She testified that, but for her condition, she would have continued to work. (*Id.*).

### 3.    *Medical Evidence*

A significant amount of the medical evidence in the administrative records consists of

treatment notes outside of the time period relevant in this case – October 1, 1999 to December 31, 2004.[2]  Such records are discussed herein only to the extent they shed light on Carey's condition during the relevant time period.  *King v. Sec'y of Health & Human Servs.*, 896 F2d. 204, 205-06 (6th Cir. 1990).  In addition, the court will only discuss evidence relevant to the impairment found severe by the ALJ, as Carey does not appeal the ALJ's decision not to find other severe impairments.

Only treating source records exist in the file.  Case was first treated by Dr. Kishan Kella, her family physician, with whom she had been treating since 1991.  (Tr. 146).  In notes from a January 27, 2000 check-up, Dr. Kella noted that Carey reported "feeling good," and that she was "watching [her] diet [and] doing exercise."  (Tr. 244).  Upon examination her respiratory system was clear.  *Id.*  Dr. Kella appears to have ordered a pulmonary function test ("PFT") on this date, however the notations accompanying this order are difficult to read and thus shed no light on the reason for the test.  (*Id.*).  Also, there is no PFT in the record from around this time.

At an appointment on April 18, 2000, Carey reported "doing good," there was no mention of any pulmonary issues and her respiratory system was clear.  (Tr. 243).  Dr. Kella added Claritin to her prescriptions.  (*Id.*).[3]  At an appointment on July 20, 2000, Carey presented

---

[2] For applications concerning disability insurance benefits, "the only necessary inquiry is whether the claimant was disabled prior to the expiration of his insured status."  *Key v. Callahan*, 109 F.3d 270, 274 (6th Cir. 1997).  *See also* Tr. 46; 94 (listing alleged onset date and date last insured).

[3] On October 15, 2009, Carey submitted, by mail, additional records to the ALJ.  (Tr. 251-53).  These records include a May 1, 2000 bill for services, which appears to include several diagnoses, including COPD, coded for billing purposes.  (Tr. 253).  Carey submitted these records approximately thirty days after the ALJ closed the record.  (*See* Tr. 25-26) (ALJ agreed to leave record open for thirty days from the August 17, 2009 hearing, for the purpose of accepting additional medical evidence.  The ALJ did not mention these records in her decision, nor did the Appeals Council.  And, Carey does not appear to argue that the records were timely submitted and should have been considered.  In addition, Carey does not argue that the case

with a possible sinus infection, and Dr. Kella noted there was "no cough." (Tr. 242). Carey reported walking forty-five minutes a day. (*Id.*). Upon examination, Dr. Kella found her respiratory system clear. (*Id.*). He diagnosed sinusitis and prescribed Amoxil. (*Id.*). At a

---

should be remanded under Sentence Six of the Act for consideration of this evidence. Remand to consider new evidence is appropriate only when the evidence is material, and good cause is shown as to why it was not presented at the prior proceeding. 42 U.S.C. § 405(g); *Willis v. Sec'y of Health & Human Servs.*, 727 F.2d 551, 554 (6th Cir. 1984). New evidence is "material" if there is "a reasonable probability that the [Commissioner] would have reached a different disposition of the disability claim if presented with the new evidence." *Sizemore v. Sec'y of Health & Human Servs.*, 865 F.2d 709, 712 (6th Cir. 1988). "Good cause" requires the claimant to demonstrate "a reasonable justification for the failure to acquire and present the evidence for inclusion in the hearing before the ALJ." *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2002).

However, even if Carey had so argued, the court finds that the 2000 billing records are not material, and that good cause for their absence from the record was not shown. The court is not aware of any evidence as to why these records, which appear to have been in Carey's possession, could not have been presented to the ALJ at the time of the hearing, or within the thirty-day window provided for supplementing the record post-hearing. In addition, the court finds that there is not a reasonable probability that the one billing record referencing a diagnosis of COPD would have caused the ALJ to reach a different conclusion. First, the treatment records around the same time do not contain a COPD diagnosis. (Tr. 243). Second, despite presenting to Dr. Kella numerous times over the next at least 20 months, Carey's respiratory system checked out as "clear," and Dr. Kella did not diagnose or reference COPD at any of those appointments. Finally, a diagnosis of a disease alone is not sufficient to render a claimant disabled. *See Dukes v. Comm'r of Soc. Sec.*, No. 10-436, 2011 U.S. Dist. LEXIS 105526 at *16, 2011 WL 4374557 (W.D. Mich. Sept. 19. 2011) *quoting McKenzie v. Comm'r of Soc. Sec.*, No. 99-3400, 2000 U.S. App. LEXIS 11791, 2000 WL 687680 at *5 (6th Cir. May 19, 2000) ("[T]he mere diagnosis of an impairment does not render an individual disabled nor does it reveal anything about the limitations, if any, it imposes upon an individual."). That disease must interfere with the claimant's ability to work so severely that the claimant is unable to perform any substantial gainful activity. 42 U.S.C. §§ 423(d)(1)(A). Here, while the new records appear to show that Carey was diagnosed with COPD as early as 2000, at that time Dr. Kella made no changes to her treatment plan as a result. (Tr. 236-44). She was not even prescribed an inhaler until 2002, and, according to the records, did not have a PFT until 2002, and then not again until 2006. (Tr. 145; 149-50; 158-60; 233-34; 249). She was not evaluated by a pulmonologist until 2007. (Tr. 165-66). Furthermore, during the benefits time period in question, Dr. Kella's treatment records repeatedly note Carey as doing or feeling "good," and her daily activities during this period contradict a finding of total disability. (*See generally* the background section of this Report and Recommendation). Therefore, even if Dr. Kella did diagnose Carey with COPD in 2000, there is no reasonable probability that the new record alone would have resulted in the ALJ giving any additional weight to his 2009 limitations assessment. In sum, the court finds that the ALJ did not err in not referencing the new records, and that there is not good cause to remand this case pursuant to Sentence Six of the Act for consideration of that evidence.

check-up on October 10, 2000, Carey again reported feeling well, but said that Claritin was not helping her. (Tr. 241). Upon examination, Dr. Kella found her respiratory system clear, and made a notation that a CT scan was "clear" (though there is no CT scan in the record from this period). (*Id.*). He diagnosed her with allergic rhinitis and prescribed Allegra in place of the Claritin. (*Id.*).

At an appointment on January 4, 2001, Carey presented for a check-up and medication refills. (Tr. 240). She reported wanting to lose weight. (*Id.*). Upon examination, Dr. Kelly noted a clear respiratory system. (*Id.*). However, he again ordered a PFT, this time with the notation "COPD." (*Id.*). No PFT appears in the file for a date around this time, however. Dr. Kella appears to have diagnosed Carey with allergies and added captodiamine, an antihistamine,[4] to her medicine regimen. (*Id.*). Carey presented to Dr. Kella four more times in 2001. (Tr. 236-39). At each appointment there were no complaints about shortness of breath or other respiratory ailments, though twice she was diagnosed with a sinus infection. (*Id.*). In addition, at each appointment her respiratory system was clear upon examination. (*Id.*). There were no medications added to her regimen relating to breathing problems and Dr. Kella ordered no tests relating to breathing. (*Id.*).

At a checkup on January 4, 2002, Carey reported feeling "good" and upon examination her respiratory system was clear. (Tr. 234). Dr. Kella again ordered a PFT, and made a notation of "moderate COPD." (*Id.*). He made no changes to her medicine regimen, however. (*Id.*). Carey underwent a PFT more than eight months later, on September 17, 2002, the interpretation of which found "moderate obstructive disease may exist[;] cannot exclude restrictive disease by FVC [forced vital capacity] test alone. Suggest TLC [total lung capacity] determination." (Tr.

---

[4] *See* http://en.wikipedia.org/wiki/Captodiame. (Last visited April 2, 2012).

249).  At an appointment with Dr. Kella that same day, Carey presented with allergies, nasal drainage, itchy eyes and throat and a cough.  (Tr. 232).  The notation next to her respiratory system examination finding is illegible, but it is something other than "clear."  (*Id.*).  Dr. Kella noted that Carey's mother had asthma, and he noted the findings of the PFT.  He prescribed her Amoxil and Medrol and gave her an injection of Depo-Medrol, used to treat inflammation, including bronchial asthma and allergic rhinitis.  (*Id.*).[5]  At a check-up appointment on November 25, 2002, Carey reported no breathing issues, and her respiratory system was clear upon examination.  (Tr. 233).  Dr. Kella prescribed her an Albuterol inhaler. (*Id.*).

At an appointment on February 22, 2003, Carey again reported sinus problems and congestion.  (Tr. 231).  Her respiratory system was clear upon examination.  (*Id.*).  Dr. Kella diagnosed sinusitis and prescribed Amoxil as well as having Carey walk an hour a day.  (*Id.*).  At an appointment on May 14, 2004, Carey reported needing her sinuses checked due to sneezing and a runny nose.  (Tr. 230).  Her respiratory system was clear upon examination.  (*Id.*).  She was again diagnosed with sinusitis and prescribed Amoxil and a nasal spray.  (*Id.*).  At a check-up on May 20, 2003, Carey reported having been dizzy one day, but otherwise feeling "good."  (Tr. 229).  Her respiratory system was again clear upon examination and her prescription regimen remained the same.  (*Id.*).  At an appointment on June 17, 2003, Carey reported coughing and chest congestion, however her respiratory system was still clear upon examination.  (Tr. 228).  She was diagnosed with allergic rhinitis and prescribed an illegible medication.  (*Id.*).  A check-up on August 19, 2003 stated that Carey had been in Georgia on vacation, but was otherwise unremarkable.  (Tr. 227).  Once again, her respiratory system was clear.  (*Id.*).

At a check-up on September 16, 2003, Carey again reported feeling "good" and had a

---

[5] *See* MedicineNet.com at http://www.medicinenet.com/methylprednisolone/article.htm.  (Last visited April 2, 2012).

clear respiratory system upon examination. (Tr. 226). Dr. Kella gave Carey a peak flow machine and instructed her on its use. (*Id.*). He also appears to have ordered a PFT (or at least he circled it on her chart). (*Id.*). No PFT results are found in the file that correlate to this date, however. In addition, Dr. Kella did not prescribe any additional medications for any problems relating to Carey's breathing. (*Id.*). Check-ups on December 15, 2003, March 2, 2004 and August 24, 2004 were all unremarkable, with Dr. Kella reporting a clear respiratory system each time. (Tr. 214, 224-225). At an appointment on November 16, 2004, Dr. Kella specifically diagnosed COPD in the diagnosis section of his notes, though on that date Carey's respiratory system was clear upon examination. (Tr. 213). Dr. Kella refilled her medications and recommended another check-up in three months. (*Id.*).

Records post-dating the benefits period are fairly similar to the earlier ones. Carey's 2005 and 2006 records from Dr. Kella are fairly illegible due to poor quality of the copies, but it appears that at least twice in 2005 she complained of chest congestion, once coughing up green mucous. (Tr. 206-212). However, even on the date when Carey made those complaints, Dr. Kella found her respiratory system to be clear. (Tr. 211). A PFT conducted on April 25, 2006, found that "moderate obstructive disease may exist," that that it "could not exclude restrictive disease by FVC testing alone." (Tr. 181). A TLC determination was suggested. (*Id.*). Carey's 2006 records (Tr. 197-205) document frequent cold, allergy and sinus issues, some coughing, and an anaphylactic reaction until October, where Dr. Kella again diagnosed COPD, though he found her respiratory system to be clear (Tr. 198).

A pre- and post-medication PFT conducted on August 8, 2006, by Dr. Raana Akbar, an allergist, revealed severe obstructive and restrictive pulmonary disease that "improves post bronchodilator." (Tr. 158-60). Another PFT conducted on September 8, 2006, revealed "severe

pulmonary obstructive lung disease that improves with bronchodilator therapy." (Tr. 145; 149-50). A CT scan of Carey's chest on September 13, 2006, noted "[e]myphysematous changes are seen within the lungs," but found that "[t]he lungs are clear," and diagnosed her with COPD. (Tr. 171). A second PFT conducted on February 5, 2007, by Dr. Akbar revealed "severe obstructive pulmonary disease with concomitant restrictive effects" that "improves somewhat post bronchodilator." (Tr. 143). At that appointment, he recommended to Dr. Kella that Carey may need a pulmonology evaluation. (*Id.*).

It was not until March 19, 2007, that Carey was evaluated by pulmonologist Dr. Babu Paidipaty, M.D. (Tr. 165-66). He noted that Carey had been started on Advair and Proventil after a PFT that showed COPD and emphysema. (Tr. 165). After reviewing her PFT and her CT scan, Dr. Paidipaty recommended that Carey continue the Advair. He also added Spiriva and Albuterol to her regimen. (Tr. 166). At a follow-up appointment with Dr. Akbar on March 22, 2007, Carey reported that her symptoms, including shortness of breath, were worse, although a broncho test revealed "slightly better severe pulmonary obstructive lung disease." (Tr. 141-42). Upon examination Dr. Akbar noted that her chest was "essentially clear. No rales, wheezes, or rhonchi." (Tr. 142). He added Uniphyl and a nasal spray to Carey's regimen. (Tr. 141). A PFT conducted on the same day revealed, pre-medication, "severe obstruction as well as low vital capacity, possibly from a concomitant restrictive defect." (Tr. 138). Post-medication it revealed "moderate obstruction as well as low vital capacity, possibly from a concomitant restrictive defect." (*Id.*). A CT scan of Carey's chest on April 2, 2007, when compared with her CT scan of September 2006 revealed "changes consistent with obstructive pulmonary disease without evidence of pneumatoceles, bulla, atelectasis, pneumothorax or effusions." (Tr. 167-68; 161). There was no evidence of pulmonary embolism, and Carey's lungs showed no evidence of

effusion, pneumothorax or congestion.  (*Id.*).

On June 18, 2007, Carey had a follow-up visit with Dr. Paidipaty.  (Tr. 164).  Carey complained of coughing with sputum production and shortness of breath that worsened upon exertion.  (*Id.*).  Upon examination, Dr. Paidipaty noted that Carey had no rales, rhonchi, or bronchial breathing.  (*Id.*).  He diagnosed her with COPD and emphysema, discontinued her Uniphyl and Singulair, but continued her Advair and Albuterol inhaler.  (*Id.*).  At an appointment with Dr. Kella on July 20, 2007, Carey reported feeling good and watching her diet.  (Tr. 194).  Her respiratory system was clear upon examination, though Dr. Kella assessed COPD.  (*Id.*).  A PFT conducted that same day revealed that "severe obstructive disease may exist" but that it "cannot exclude restrictive disease by FVC testing alone."  (Tr. 178).

On August 20, 2009, Dr. Kella completed a medical source statement diagnosing "advanced COPD," and indicating, by check marks, Carey's functional limitations.  (Tr. 223).  In it, he concluded she was only capable of lifting less than ten pounds occasionally or frequently, could stand or walk less than two hours out of an eight-hour day, could sit less than six hours out of an eight-hour day and had mild limitations in pushing and pulling.  (*Id.*).  He also found that she could not be exposed to dust or fumes.  (*Id.*).  Dr. Kella concluded that Carey's limitations had existed since 1999 and that they would disrupt her work approximately 140 hours out of a 160 hour month, even at a job with low physical demands.  (*Id.*).

### 4. *Vocational Expert's Testimony*

The VE testified that Carey's past relevant work was as a general office clerk, classified as sedentary and semi-skilled in nature.  (Tr. 41).  The ALJ then asked the VE to imagine a claimant of Carey's age, education, and work experience, who could only lift up to ten pounds occasionally, and less than that frequently, who could not climb ladders, ropes or scaffolds, and

could only occasionally climb ramps or stairs.  (Tr. 42).  In addition, the hypothetical claimant could only frequently balance, could have no exposure to extreme heat or humidity, and have no prolonged exposure to fumes, odors, dusts, gases, chemicals, moving machinery or unprotected heights.  (*Id.*).  The ALJ asked the VE if such a person could perform Carey's past relevant work.  (*Id.*).  The VE testified that she could.  (Tr. 42).  The ALJ then asked if such a hypothetical claimant needed to rest for approximately two hours a day or needed to be off work an average of four days a month, whether that would preclude the past relevant work.  (Tr. 43).  The VE testified that it would.  (Tr. 44).

### C.     Framework for Disability Determinations

For applications concerning disability insurance benefits, "the only necessary inquiry is whether the claimant was disabled prior to the expiration of his insured status."  *Key*, 109 F.3d at 274.  This is because a "'period of disability' can commence only while an applicant is fully insured.  *Jones v. Comm'r of Social Security*, 121 F.3d 708 (6th Cir. 1997) (citing 42 U.S.C. § 416(i)(2)(C)).  *See also Hamilton v. Apfel*, 178 F.3d 1294 (6th Cir. 1999) (citing *Moon v. Sullivan*, 923 F.2d 1175, 1182 (6th Cir. 1990)); 42 U.S.C. § 423(a), (c) and (d).  Accordingly, a claimant who fails to prove she was suffering from a disability *while insured* does not become entitled to disability insurance benefits if she becomes disabled *after* her insured status expires.  *Id.*  This does not mean, however, that evidence post-dating the claimant's date last insured is irrelevant to the disability determination.  Rather, while the ALJ generally only considers evidence from the alleged disability onset date through the date last insured, he may also consider later evidence to the extent it relates back to the claimant's condition during the relevant period.  *King*, 896 F.2d at 205-06.

Under the Act, DIB are available only for those who have a "disability."  *See Colvin v.*

*Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). The Act defines "disability" in relevant part as the

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

The Commissioner's regulations provide that a disability is to be determined through the application of a five-step sequential analysis:

> Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

> Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

> Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.

> Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

> Step Five: Even if claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

*Scheuenieman v. Comm'r of Soc. Sec.*, No. 11-10593, 2011 U.S. Dist. LEXIS 150240 at *21 (E.D. Mich. Dec. 6, 2011) *citing* 20 C.F.R. §§ 404.1520, 416.920; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "The burden of proof is on the claimant throughout the first four steps . . . . If the analysis reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the [defendant]." *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

### D.    The ALJ's Findings

Following the five-step sequential analysis, the ALJ determined that Carey was not disabled.  (Tr. 12-18).  At Step One, the ALJ determined that Carey had not engaged in substantial gainful activity since her alleged onset date, through her date last insured of December 31, 2004.  (Tr. 14).  At Step Two, she found that Carey had the severe impairment of COPD.  (*Id.*).  At Step Three the ALJ determined that Carey's impairment did not meet or medically equal a listed impairment.  (*Id.*).  The ALJ then assessed Carey's residual functional capacity ("RFC") finding her capable of: "sedentary work as defined in 20 CRF 404.1567(a) except no climbing ladders, ropes or scaffolds; occasional climbing of ramps or stairs; frequent but no constantly balancing; no exposure to extremes of heat or humidity; no exposure to environmental irritants such as fumes, odors, dusts, gasses and chemicals and no exposure to unprotected heights."  (Tr. 14-15).  At Step Four, the ALJ determined that, based upon Carey's age, education, work experience and RFC assessment, she could perform her past relevant work and thus was not disabled under the Act.  (Tr. 17).

### E.    Standard of Review

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g).  Judicial review under this statute is limited in that the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record."  *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal citations omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the

14

merits or deprived of substantial rights because of the agency's procedural lapses.") (internal quotations omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted). In deciding whether substantial evidence supports the ALJ's decision, the Court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings for substantial evidence, the Court is limited to an examination of the record and must consider the record as a whole. *Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council," or in this case, the ALJ. *Heston*, 245 F.3d at 535; *Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal quotations omitted). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted).

**F.      Analysis**

Although Carey frames her motion around an assertion that the Commissioner erred by forming a hypothetical that did not accurately portray her impairments, in reality she alleges that the ALJ committed three distinct errors:   First, she claims the ALJ improperly weighed Dr. Kella's 2009 functional capacity report; second, she argues that the ALJ erred in assessing her credibility; and finally, she asserts that the ALJ erred in issuing an RFC in her opinion that differed in a substantial respect from the one she posed to the VE as a hypothetical.   Carey concludes that the ALJ's decision is not supported by substantial evidence and must be remanded.   The court will consider Carey's arguments in turn.

*1.      The ALJ's Weighing of Dr. Kella's Functional Capacity Report*

Carey first argues that the ALJ's decision was not supported by substantial evidence because she failed to give Dr. Kella's 2009 functional capacity report the weight it deserved as the opinion of a treating physician.   A treating physician's opinion is entitled to controlling weight where it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and is "not inconsistent with the other substantial evidence in the case record." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) *quoting* 20 C.F.R. § 404.1527(d)(2).   If an ALJ declines to give a treating physician's opinion controlling weight, she must then determine how much weight to give the opinion, "by considering a number of factors, including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician." *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) *citing Wilson*, 378 F.3d at 544; *see also* 20 C.F.R. § 404.1527(d)(2).   The ALJ must give good reasons, supported by substantial evidence in the

record, for the ultimate weight given to a treating source opinion. *Id.*, *citing Soc. Sec. Rul*. 96-2p, 1996 SSR LEXIS 9 at *12, 1996 WL 374188 at *5.

At issue here is Dr. Kella's 2009 functional capacity opinion in which he imposed significant limitations on Carey that he indicated were equally disabling to her as far back as 1999. The ALJ determined that that opinion was not entitled to the weight normally afforded treating physician opinions (and in fact, was entitled to "no weight") because it was not supported by medical documentation and it was inconsistent with the medical record as a whole "during the period in question," *i.e.*, October 1, 1999 through December 31, 2004. (Tr. 16). Contrary to Carey's arguments, the ALJ's conclusion is supported by substantial evidence.

As the ALJ noted, although Carey had a PFT in September 2002 and had been prescribed Albuterin in 2000,[6] there appears to have been no direct diagnosis of any respiratory ailment in any of the records during the time period in question until November 16, 2004, when Dr. Kella first specifically diagnosed Carey with COPD.[7] (Tr. 15-16). This includes Dr. Kella's own treatment notes spanning back to 1999. As the ALJ further noted, on the date of diagnosis Carey had clear lungs upon examination, and "there was no treatment plan or medication prescribed for [COPD]" – at least not one that differed in any way from her prior prescribed regimen. (Tr. 15). Relatedly, Dr. Kella's treatment notes do not indicate any of the types of restrictions which

---

[6] From the relevant treatment notes it appears that Dr. Kella prescribed Carey Albuterol in 2002 (Tr. 233), not July 2000 (Tr. 242) as stated by the ALJ.

[7] This is based on the fact that Dr. Kella's treatment record from January 4, 2002, noted "moderate COPD" in a notation next to a request for a PFT, not in the diagnosis section of his notes where he generally wrote Carey's diagnoses. (Tr. 234). However, even if the notation of "moderate COPD" could be considered a diagnosis, the court's opinion would not change because, as noted above, a diagnosis alone is not sufficient to satisfy the standard for disability, and Dr. Kella's corresponding and subsequent treatment of Carey, coupled with her daily activities, are inconsistent with a finding that her condition in January 2002 was disabling. *See supra*, fn. 3; 42 U.S.C. §§ 423(d)(1)(A).

might support a finding that any impairment Carey was suffering from was disabling.

The ALJ also noted that another PFT was not conducted until April 2006, and again in August 2006, where Dr. Akbar diagnosed severe COPD that was improved by a bronchodilator. (Tr. 17; 181). However, this evidence post-dates the benefits period, and thus is minimally persuasive, and the ALJ had the right to refuse to extrapolate from it some other conclusion about Carey's condition during the relevant period. (Tr. 17); s*ee Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987) (treating physician opinion rendered eight months after expiration of insured status was minimally probative where claimant suffered from degenerative disorders); *Swain v. Comm'r of Soc. Sec.* , 379 Fed. Appx. 512, 517 (6th Cir. 2010) (Sixth Circuit "has held that a treating physician's opinion is minimally probative when the physician began treatment after the expiration of the claimant's insured status.").[8] In addition, as the ALJ noted, Carey's significant daily activities, which included mowing the lawn with a

---

[8] Carey's attempt to compare the values of her 2002 and 2006 PFTs to demonstrate that she had COPD in 2002, and that it was as severe then as it was in 2006, is unavailing. [7, at 10-11]. First, as noted above, the salient question is not whether Carey was diagnosed with COPD during the relevant period, but rather, whether she was disabled, under the statute, at that time. *Supra*, fn. 3. Second, although the raw data of the 2002 and 2006 PFTs is part of the record, the record does not include any opinion or other medical evidence from which the ALJ or the court can make the type of empirical comparisons urged by Carey. For instance, Carey states that her September 2002 FVC value of 1.50 is "almost identical" to her August 2006 value of 1.67. [8, at 10]. However, the record simply contains no evidence from which one can reach that medical conclusion, and it is not permissible for the ALJ or this court to go outside the record to evaluate a claimant's medical condition *ad hoc*. *See Shackelford v. Comm'r of Soc. Sec.*, No. 10-604, 2011 U.S. Dist. LEXIS 105648, *43-44, 2011 WL 4351607 (S.D. Ohio Aug. 24, 2011) *adopted by* 2011 U.S. Dist. LEXIS 108158, 2011 WL 4350206 (S.D. Ohio Sept. 16, 2011). It is the claimant's burden, especially here where Carey is represented by counsel, to provide the ALJ with evidence supporting a claim for disability. *Rise v. Apfel*, No. 99-6164, 2000 U.S. App. LEXIS 26851 at *4 (6th Cir. Oct. 13, 2000) *citing* 20 C.F.R. § 404.1512(a) *and Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990). Carey points to no medical evidence in the record contradicting the impressions drawn by the doctors interpreting the 2002 or 2006 PFT, nor does this court find any in its review of the record. Thus, without conflicting medical evidence, the ALJ was right to rely on the impressions of the PFTs in rendering her opinion, and the court cannot fairly characterize any discrepancies as mere semantics as Carey suggests. [8, at 10].

mask, attending church twice a week, visiting with church friends and assisting the pastor, walking a half mile, shopping, cooking and cleaning, undermine Dr. Kella's severe restrictions. (Tr. 17).

In sum, the court finds that the ALJ gave good and sufficient reasons for rejecting Dr. Kella's 2009 functional capacity report, at least insofar as it purported to opine on the extent of Carey's impairments during the relevant period between October 1 and December 31, 1999, and that her decision is supported by substantial evidence.

### 2. The ALJ's Assessment of Carey's Credibility

Carey argues that the ALJ failed to adequately assess her credibility, specifically her complaints of pain.[9]  The Sixth Circuit has held that an ALJ is in the best position to observe a witness's demeanor and to make an appropriate evaluation as to her credibility.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997).   Thus an ALJ's credibility determination will not be disturbed "absent compelling reason."  *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001).   When a complaint of pain is in issue, after the ALJ finds a medical condition that could reasonably be expected to produce the claimant's alleged symptoms, she must consider "the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians . . . and any other relevant evidence in the case record" to determine if the claimant's claims regarding the level of her pain are credible.  *Soc. Sec. Rul.* 96-7, 1996 SSR LEXIS 4 at *3, 1996 WL 374186 (July 2, 1996); *see also* 20 C.F.R. § 404.1529.

Here, the ALJ recognized the requirements imposed upon her by the regulations, and

---

[9]  Although Carey did not allege pain in the traditional sense this court usually observes, it assumes by her brief that she is equating shortness of breath, the need to take frequent rest breaks, problems with heat, humidity and environmental irritants, dizziness, balance problems, fatigue and concentration issues with "pain."  [8, at 14].

found that while Carey's conditions could reasonably be expected to produce the alleged symptoms, her statements about their intensity, persistence and limiting effects were not credible to the extent they conflicted with the RFC assessment. (Tr. 17). The ALJ assessed the evidence and found Carey "was not significantly limited in her physical or mental abilities [during the benefits period] as to preclude her from performing basic work activities." (Tr. 16). In addition to evaluating the medical evidence, the ALJ also noted Carey's daily activities as justification for her decision, finding that Carey's ability to drive, attend church, cook, care for her personal needs, walk a half a mile, mow the lawn, watch television, shop and do light household chores contradicts her allegations of disabling symptoms. (Tr. 17). Thus, the ALJ's credibility determination is supported by substantial evidence in the record and will not be disturbed.

### 3. The ALJ's RFC Assessment As Compared with the Hypothetical Question Posed to the VE.

Finally, Carey argues that the ALJ erred in posing a less restrictive RFC assessment in her hypothetical question to the VE than the one she ultimately imposed in her written decision. Specifically, Carey is referring to the fact that, at the hearing, the ALJ asked the VE to hypothesize about a claimant whose restrictions included "no *prolonged* exposure" to environmental irritants (Tr. 42), whereas in her written opinion the ALJ issued a limitation including "*no* exposure" to environmental irritants. (Tr. 15) (emphasis added). Carey argues that because this more restrictive limitation was not included in the hypothetical posed to the VE, the ALJ could not rely on the VE's testimony and thus her decision is not supported by substantial evidence.

The court notes that the ALJ determined that Carey was capable of performing her past relevant work as "generally performed," and concluded, at Step Four, that Carey was therefore not disabled. (Tr. 17). Although the ALJ elicited VE testimony at the hearing, she did not state

in her opinion that her finding at Step Four was based on VE testimony. As the Commissioner correctly notes in his brief, an ALJ is not required to solicit VE testimony in order to determine whether a claimant is capable of performing her past relevant work. *Wright-Hines v. Comm'r of Soc. Sec.*, 597 F.3d 392, 395 (6th Cir. 2010); 20 C.F.R. §§ 404.1560(b)(2), 416.960(b)(2) ("[w]e *may* use the services of vocational experts . . . to obtain evidence we need to help us determine whether you can do your past relevant work, given your residual functional capacity."). Notably, the regulations also state that the ALJ may also consider other evidence, such as the Dictionary of Occupational Titles ("DOT") to obtain evidence to determine whether a claimant can perform her past relevant work. 20 C.F.R. §§ 404.1560(b)(2), 416.960(b)(2).

Here, it appears the ALJ relied on the DOT in rendering her decision, as she stated that, "[i]n comparing the claimant's residual functional capacity with the physical and mental demands of this work [general office clerk], the undersigned finds that the claimant was able to perform it as generally performed." (Tr. 17). While she did not specifically cite to the physical and mental demands of such work, the DOT job categories for a number of positions that fall under the general heading of general office clerk do not involve exposure to environmental contaminants. *See e.g. Dict. Of Occ. Titles* 209.562-010, 1991 WL 671792 (Clerk, General); 237.367-022, 1991 WL 672188 (Information Clerk); *and* 237.367-038, 1991 WL 672192 (Receptionist). And, nowhere in the record is there evidence that Carey's past relevant work as an office clerk involved any exposure to environmental irritants, let alone prolonged exposure. Furthermore, the VE testified that there were "literally thousands of job titles" within the category of general office clerk. (Tr. 41). Thus, while the ALJ did not specifically outline her reasoning why Carey could perform her past relevant work, the court finds that her decision is supported by substantial evidence in the DOT, upon which it appears she relied to render her

decision. Because the ALJ did not rely on VE testimony to render her decision, any conflict between her final RFC assessment and the one she posed to the VE at the hearing is immaterial.

## III.    CONCLUSION

For the foregoing reasons, the court RECOMMENDS that Carey's Motion for Summary Judgment [8] be DENIED, the Commissioner's Motion [10] be GRANTED and this case be AFFIRMED.

Dated: April 11, 2012                      s/David R. Grand
Ann Arbor, Michigan                      DAVID R. GRAND
                                         United States Magistrate Judge

## NOTICE

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and Fed.R.Civ.P. 72(b)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505, 508 (6th Cir.1991); *United States v. Walters*, 638 F.2d 947, 949–50 (6th Cir.1981). The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir.1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir.1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on April 11, 2012.

s/Felicia M. Moses
FELICIA M. MOSES
Case Manager